[No. A073106. First Dist., Div. Two. Sept. 16, 1997.]

NEIL FITZPATRICK et al., Plaintiffs and Appellants, v.
TED HAYES et al., Defendants and Respondents.

COUNSEL

DeGoff & Sherman, Victoria J. DeGoff, Richard Sherman, Walkup, Melodia, Kelly & Echeverria and Paul V. Melodia for Plaintiffs and Appellants.

McDowall, Cotter Dunn, Vale & Bracco and William D. McDowall for Defendants and Respondents.

OPINION

**HAERLE, Acting P. J.—**

## I. INTRODUCTION

This is an appeal from a summary judgment entered by the trial court on the motion of the respondents, a well-known national insurance company and one of its agents. The appellants are a woman who was badly injured in a 1994 automobile accident caused by an underinsured motorist, and her husband. In a San Francisco Superior Court action brought the following year, they alleged, inter alia, that respondents were negligent in not advising them of the availability of personal umbrella coverage which, if in effect at the pertinent point in time, would have resulted in their being more adequately compensated for the injuries they suffered as a result of the accident. The trial court ruled that, under existing law, the respondents did not have a duty to advise appellants of the availability of, or procure, such coverage.

We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On October 13, 1994, appellant Judith Fitzpatrick was struck by a car while standing near her Lexus automobile on a street in San Rafael. She suffered substantial brain damage. Her husband, appellant Neil Fitzpatrick, witnessed the accident and allegedly suffered resulting emotional distress as well as loss of consortium. Their claimed damages exceeded $1 million.

The driver who injured Judith Fitzpatrick had insurance coverage that would pay only $15,000 damages as a result of the accident, with a maximum of $30,000 per accident. As a consequence, that insurer paid Judith Fitzpatrick $15,000 and Neil Fitzpatrick another $15,000. Under their automobile insurance policy with respondent State Farm, the Fitzpatricks' uninsured/underinsured coverage was $100,000 per person. As a consequence, State Farm paid Judith only $85,000 under that policy.

The Fitzpatricks had been insured by State Farm through co-respondent Ted Hayes Insurance Agency for more than 20 years. The Fitzpatricks used State Farm, via the Hayes Agency, for both personal insurance and insurance covering Neil Fitzpatrick's construction business. The latter requested insurance on the Lexus from Hayes when the car was first purchased in 1990. When originally purchased, the Lexus was insured through Neil Fitzpatrick's business; its liability "limits" were $500,000 and its uninsured/underinsured motor vehicle insurance limits were $100,000 per person and $300,000 per accident. On the advice of the Fitzpatricks' accountant, the insurance was changed to personal coverage the following year, although the coverage limits remained as before. Appellants examined this policy upon receiving it.

On no occasion did either appellant ask Hayes, or anyone else connected with State Farm, any questions about any of the coverages on the Lexus. Specifically, neither appellant ever asked Hayes, or anyone else connected with State Farm, any questions about higher uninsured/underinsured motor vehicle coverage.

The maximum uninsured/underinsured coverage State Farm offered in an automobile policy was, as with the policy applicable to the Lexus, $100,000 per person and $300,000 per accident. However, State Farm also offered another kind of insurance called a "personal umbrella" policy which, had it been in effect, would have provided $1 million in coverage to the Fitzpatricks for both automobile liability, homeowners liability, and uninsured/underinsured motorists coverage. In order to purchase this policy, an insured had to be a "good driver," but the Fitzpatricks so qualified at all pertinent times. The personal umbrella coverage would not have resulted in a substantial additional premium cost to the Fitzpatricks.

In opposition to the motion for summary judgment, appellants presented evidence that, if they had been informed of the opportunity to purchase such coverage for substantially the same premium cost, they would have done so. Indeed, after the accident, the Fitzpatricks inquired of Hayes regarding the availability of uninsured/underinsured coverage under a personal umbrella policy and did purchase such a policy through him.

By way of further opposition to respondents' summary judgment motion, appellants adduced evidence that State Farm instructs its agents to review their clients insurance needs and to make recommendations regarding coverage. It also established that State Farm had a nationally advertised "Family Insurance Checkup" program.

Finally, appellants adduced evidence that Hayes did not recommend that the Fitzpatricks obtain additional uninsured/underinsured motor vehicle coverage at the time they purchased the Lexus nor, at a 1991 meeting between

the Fitzpatricks and Hayes to discuss insurance coverage on the Fitzpatricks' investment real estate, did he mention the availability or advantages of a personal umbrella policy.

On October 4, 1995, respondents moved for summary judgment arguing that, based on the undisputed facts, as a matter of law they had no duty to advise the Fitzpatricks about the availability of a personal umbrella policy. The Fitzpatricks opposed the motion. In so doing, and in addition to presenting some of the evidence noted above, they also filed a declaration by a former State Farm agent who opined with respect to the standard of care applicable to State Farm agents such as Hayes.

The trial court heard the summary judgment motion in November 1995 and took the matter under submission. On December 1, 1995, it entered judgment in favor of all the respondents. As noted, the judgment specifically stated that it was granted on the ground that "none of the defendants had a duty to advise plaintiffs of the availability of, and to procure, excess underinsured motor vehicle coverage, and none of the defendants undertook such a duty."

Appellants filed a timely notice of appeal the following month.

### III. DISCUSSION

The trial court's summary judgment ruling is, of course, subject to de novo review. (*580 Folsom Associates* v. *Prometheus Development Co.* (1990) 223 Cal.App.3d 1, 13-14 [272 Cal.Rptr. 227].)

The parties agree that the issue, indeed the only issue, in this appeal is whether respondents in general, and Hayes and his State Farm agency in particular, had a legal duty to respondents to advise them as to the availability of personal umbrella coverage. ■ And, of course, "[w]hether a duty of care exists is a question of law for the court. (*Wilson* v. *All Service Ins. Corp.* (1979) 91 Cal.App.3d 793, 796 [153 Cal.Rptr. 121]; *Raymond* v. *Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8-9 [31 Cal.Rptr. 847].) Also, whether, and the extent to which, a new duty is recognized is ultimately a question of public policy. (*Raymond* v. *Paradise Unified School Dist., supra.*)" (*Jones* v. *Grewe* (1987) 189 Cal.App.3d 950, 954 [234 Cal.Rptr. 717] (*Jones*).) The parties even substantially agree as to the identity of the pertinent authorities in this state defining when and under what circumstances such a duty may arise. They disagree only as to the application of those authorities to the facts of this case. To resolve this disagreement, we shall briefly review the California cases which we and the parties agree collectively provide the answer to the issue at hand.

## A. *The Authority Principally Relied Upon by Respondents*

Respondents rely principally on four relatively recent Court of Appeal decisions. The first chronologically is *Gibson* v. *Government Employees Ins. Co.* (1984) 162 Cal.App.3d 441, 444-453 [208 Cal.Rptr. 511] (*Gibson*). In that case, the court upheld a trial court order sustaining a demurrer to a complaint brought (as here) by a married couple against their insurer for alleged "breach of fiduciary duty" in not advising them of "the availability and potential need for 'underinsured motorist' coverage, as well as the inadequacy of [their] . . . medical payments benefit." (*Id.* at p. 443.) The court commenced its analysis by assuming, in view of certain language in the then viable precedent[1] of *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 768 [206 Cal.Rptr. 354, 686 P.2d 1158], that such a fiduciary duty existed between insureds and their insurer. But then it went on to discuss "how far the umbrella of fiduciary protection is to extend." (*Gibson, supra,* 162 Cal.App.3d at p. 446.) It concluded that it extended to dealings between an insured and insurer "under the contract" of insurance (*id.* at p. 447) *but not* outside of it. As applied to the facts before it, therefore, the court held that the insurer had no fiduciary duty to advise its insured of the availability of additional or extended coverage. It stated: "Plaintiffs have not cited, and we have not found, any case which extends either a fiduciary duty or a covenant of good faith and fair dealing owed by an insurer or insurance company to its insured beyond the terms of the insurance contract in force between them." (*Id.* at p. 448.) "Thus, it seems clear that any fiduciary duty existing between an insurer and its insured is governed by the terms of the insurance contract in effect between them; to the extent there is no contract, i.e., because the insurer has not extended coverage for the risk by which the insured has suffered a loss, the relationship between the parties is not controlled by principles of strict fiduciary responsibility." (*Id.* at pp. 449-450.) "Therefore, we conclude that defendant did not, as a matter of law, owe a fiduciary duty to plaintiffs to (1) make available to them a particular kind of insurance, (2) advise them of the availability of such coverage elsewhere in the industry, or (3) advise them of inadequacies in coverage of which plaintiffs should, as reasonable persons, have themselves been aware." (*Id.* at p. 452.)

The next case to consider this general proposition was the extremely brief decision of the court of appeal in *Pabitzky* v. *Frager* (1985) 164 Cal.App.3d 401 [210 Cal.Rptr. 426]. Here, again, the trial court had sustained (six times, indeed) a demurrer to a cause of action against both State Farm and one of its agents for failing to advise the plaintiff "to carry uninsured motorist

---

[1]That precedent has been, of course, completely abrogated in the interim. (See *Freeman & Mills, Inc.* v. *Belcher Oil Co.* (1995) 11 Cal.4th 85 [44 Cal.Rptr.2d 420, 900 P.2d 669].)

insurance in an amount greater than the statutory minimum." (*Id.* at pp. 402-403.) The court summarily affirmed the subsequent judgment of dismissal, stating: "We know of no duty on the part of an insurance broker to do more than to call the attention of his customer to the availability of the statutory provision and, unless expressly told to omit it, to see that the policy complies with the statute." (*Id.* at p. 403.)

The next and perhaps most significant case in this line is *Jones*, a 1987 opinion authored by then Judge (later Justice) Kennard and concurred in by then appellate court Justice Arabian. It also affirmed the action of the trial court in sustaining a demurrer to a cross-complaint brought by the owners of an apartment building against their long-time insurance broker. The building owners had settled a liability action by tenants for injuries caused to their minor daughter for $1.5 million and claimed, in their cross-complaint, that the broker was negligent in not advising them to have more than $300,000 in liability insurance coverage. In rejecting the contention that the broker owed the building owners a "duty" in such a circumstance, the court noted that, although an insurance agent or broker has a general duty "to use reasonable care, diligence, and judgment in procuring the insurance requested by an insured," generally this does not entail any obligation to " 'point out to [the insured] the advantages of additional coverage . . . .' " (*Jones, supra,* 189 Cal.App.3d at p. 954.) It went on to note, however, that an insurer or broker may "assume additional duties by an express agreement or a holding out." (*Ibid.*)

The *Jones* court concluded that the "general duty" it first identified "does not include the obligation to procure a policy affording the client complete liability protection, as appellants seek to impose here." (*Jones, supra,* 189 Cal.App.3d at p. 956.) It then addressed itself to the more difficult issue of whether, on the facts as alleged in the building owners' cross-complaint, it could be said that the broker had assumed any additional duty to the insureds. It concluded to the contrary, saying: "The mere allegation in a complaint, as in this case, that an insured has purchased insurance from an insurance agent for several years and followed his advice on certain insurance matters is insufficient to imply the existence of a greater duty. Such reliance is not at all uncommon when an insured has done business with an insurance agency over a period of time. [Citations.] Nor can the existence of a broader agency relationship warranting the imposition of a greater duty be reasonably inferred from the complaint's allegation that respondents had assured appellants of the adequacy of their liability coverage. . . . [¶] . . . [¶] We conclude that appellants' . . . cross-complaint has not alleged facts from which it could reasonably be inferred that respondents were under a duty to procure complete liability protection for appellants. To hold otherwise would, on the vague and conclusionary allegations contained in the

complaint, drastically and unilaterally expand the principal-agent relationship. [Citations.] Neither an insurance agent nor anyone else has the ability to accurately forecast the upper limit of any damage award in a negligence action against the insured by a third party. To impose such a duty based on the pleadings in this case would in effect make the agent a blanket insurer for his principal. We fail to see where sound public policy would require the imposition of such a duty upon the agent, unless the latter has by an express agreement or a holding out undertaken that obligation." (*Id.* at pp. 956-957.)

The final case in the foursome relied on by the respondents is *Ahern* v. *Dillenback* (1991) 1 Cal.App.4th 36 [1 Cal.Rptr.2d 339], a case which returns our focus to uninsured motorist coverage—or the lack thereof. That opinion affirmed the grant of summary judgment to an insurance agency and insurer in a suit brought for injuries sustained in an automobile accident in France with "an unidentified and uninsured motorist." The plaintiffs, husband and wife, alleged that the defendants breached a duty to them by not including various available coverages in a special foreign-driver insurance policy the couple purchased nor advising concerning their availability. Citing and quoting from both *Gibson* and *Jones*, the court concluded to the contrary: "Nothing in the record indicates that the Aherns had a special relation with any of the defendants. Hence, as a matter of law, the defendants did not owe the requisite duty to the Aherns to sustain their cause of action for negligent procurement of insurance." (*Id.* at p. 43.)

B. *The Authority Principally Relied Upon by Appellants*

Appellants do not dispute the viability of any of these four cases; what they dispute is the applicability of any of them to the facts of this case. They rely principally on three other cases, which they claim establish, at the minimum, exceptions to the "no duty" principle or, at the maximum, an affirmative rule that such a duty can and should be found to exist in these circumstances.

The first such case, again chronologically, is *Westrick* v. *State Farm Insurance* (1982) 137 Cal.App.3d 685 [187 Cal.Rptr. 214] (*Westrick*). There, the appellate court reversed a trial court order directing a verdict for the insurer and one of its agents. The plaintiff, the insureds, had long been a client of both State Farm and the defendant agent. In May 1977, when he was contemplating buying a jeep-type of vehicle, he was informed by the agent that, if he did, he would be automatically covered for 30 days under a standard clause in the policy, and that this was true even though the vehicle was a 4-wheel drive pickup truck. The insured did not, in fact, purchase that vehicle but, two months later, bought a welding business for his son, a

business which included several vehicles including a half-ton welding truck. Based in part on the May conversation with the agent and in part on a confused and confusing July conversation with the agent's father, another State Farm agent (his principal agent being temporarily unavailable), the insured told his son that the latter could drive the welding truck the next day, as it was insured. It wasn't, an accident occurred, and the litigation followed.

The *Westrick* court reversed the trial court's grant of a directed verdict in favor of the insurer and the agent, noting its obligation to make all reasonable inferences from the evidence in the light most favorable to the appellants. It flatly rejected the defendants' contention that the directed verdict could be sustained because the plaintiff had never requested insurance or had never requested it of the second agent (the father) observing that, from the evidence of the May and July conversations, a jury could reasonably find to the contrary.

The defendants also argued that "an insurance agent cannot be liable for an insured's lack of coverage unless the agent has first expressly promised to procure the coverage." (*Westrick*, *supra*, 137 Cal.App.3d at p. 690.) The court disagreed, stating: ". . . while an insurance agent who promises to procure insurance will indeed be liable for his negligent failure to do so [citations], it does not follow that he can avoid liability for foreseeable harm caused by his silence or inaction merely because he has not expressly promised to assume responsibility. [¶] A long line of California cases has recognized that a disparity of knowledge may impose an affirmative duty of disclosure. [Citations.] In the insurance field, the quasi-public nature of the insurer's obligation imposes upon him a duty of good faith and fair dealing, which requires the insurer to '"give at least as much consideration to the [insured's] interests as it does to its own."' [Citations.] Since ' "[i]t is a matter almost of common knowledge that a very small percentage of policyholders are actually cognizant of the provisions of their policies . . . [and t]he insured usually confides implicitly in the agent securing the insurance . . .' " [citations], the insurer's duty includes the duty 'reasonably to inform an insured of the insured's rights and obligations under the insurance policy.' [Citation.] . . . [¶] In the instant case, assuming appellant's testimony to be true, Westrick's request for insurance, his previous questions and long relationship with the agency, and the foreseeability of harm, obligated Jim Crawford to respond to the request with further inquiries." (*Id.* at pp. 691-692, fn. omitted.)

Appellants also rely on *Free* v. *Republic Ins. Co.* (1992) 8 Cal.App.4th 1726 [11 Cal.Rptr.2d 296] (*Free*), where the appellate court reversed an order of dismissal on the grant of a demurrer to a complaint which alleged,

inter alia, that a homeowner had specifically inquired—several times allegedly—of his broker as to whether "the coverage limits of his policy were adequate to rebuild his home" in the event of its destruction by fire. The complaint further alleged that, on each such occasion, "he was informed that they were," advice which he alleged was repeated to him early in the year his home was destroyed by fire. (*Id.* at p. 1729.) The court reversed, holding that the principle of *Jones* was not applicable to the facts alleged because "once [the broker] elected to respond to his inquiries, a special duty arose requiring them to use reasonable care. [¶] *Jones* v. *Grewe, supra*, does not compel a contrary conclusion. The court in that case was unwilling to impose upon the defendants, based upon allegations of the parties' long-term relationship, plaintiffs' past reliance on defendants' advice and an assurance on defendants' part of the adequacy of plaintiffs' coverage, a legal duty to provide plaintiffs with a policy of liability insurance sufficient to protect their personal assets and satisfy any judgment against plaintiffs arising out of a negligence action by a third party. [¶] . . . [¶] This case does not involve the same sorts of uncertainties. Here plaintiff sought to be protected against a very specific eventuality—the destruction of his home. It appears from the record before us that there were at least two methods by which he could have achieved his goal: (1) he could have requested a guaranteed replacement endorsement as part of his homeowners policy; or (2) he could have had the value of the building determined and a specific valuation named in the policy as provided by Insurance Code section 2052. Defendants apprised him of neither option. Nor did they decline to offer an opinion. Rather, they assured plaintiff his coverage was sufficient. Under the circumstances, defendants must be deemed to have assumed additional duties, which, if breached, could subject them to liability." (*Free, supra*, 8 Cal.App.4th at p. 1730.)

Finally, appellants rely on *Kurtz, Richards, Wilson & Co.* v. *Insurance Communications Marketing Corp.* (1993) 12 Cal.App.4th 1249 [16 Cal.Rptr.2d 259] (*Kurtz*). In that case, the court also overruled an order sustaining a demurrer without leave to amend in a case in which the complaint alleged that the plaintiff, in its quest for group medical, life and accident insurance for its employees, had relied on the defendant broker "who held themselves out as expert brokers and agents in the field." (*Id.* at p. 1255.) As part of the process of securing policies, the broker's representative allegedly urged the insured's treasurer to sign a "TEFRA certificate" representing that the group plan was not subject to Medicare. In fact, the insured was subject to Medicare, and when the insurer sought to rescind the policy due to alleged misrepresentations by the broker on behalf of the insured, the latter crosscomplained against the broker, alleging reliance on the latter's expertise in signing the offending certificate. Citing *Jones*, the court that "[a]n agent may assume additional duties by . . . holding himself . . . out as having specific

expertise" and noted that the cross-complaint alleged facts "that if true would establish that they entered into a relationship with [the plaintiff] . . . including a special duty assumed when they held themselves out as experts on TEFRA." (*Id.* at p. 1257.)

## C. *Recent Authority Cited by Both Parties*

Both parties cite, and to some degree rely upon, two relatively recent cases in this area, *Desai* v. *Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110 [55 Cal.Rptr.2d 276] (*Desai*) and *Paper Savers, Inc.* v. *Nacsa* (1996) 51 Cal.App.4th 1090 [59 Cal.Rptr.2d 547] (*Nacsa*). Indeed, in supplemental briefs and at oral argument, both parties relied heavily on favorable—to them—aspects of the latter case.

In the former, the trial court sustained a demurrer (without leave to amend) as to a complaint alleging that Farmers was liable for not living up to the representations allegedly made to the plaintiff-insured by its agent that he was getting 100 percent replacement cost coverage in his real property insurance. (*Desai, supra,* 47 Cal.App.4th at p. 1114.) Farmers, relying on the authority cited in part A, *ante*, argued that it could not be held liable for its agent's alleged negligence. The appellate court disagreed, opining that "[n]one of the cited cases is on point." (*Id.*, at p. 1119.) It summarized the holdings of these cases as follows: "In each instance, the insured was suing its insurer for failing to (1) *recommend additional* coverage or (2) *spontaneously procure* unrequested additional coverage for its insured or (3) *advise* that additional coverage was *available*. That is not the case here. [The insured] is suing because the insurer (through its agent) negligently represented that the policy in fact provided the 100 percent replacement cost coverage that [he] demanded . . . . [¶] . . . This is not a 'failure to recommend more coverage' case; it is a 'failure to deliver the agreed-upon coverage' case." (*Ibid.*)

In the more recent *Nacsa* case, the trial court had granted summary judgment against a plaintiff who had alleged that his insurance agent had represented to him that the insurance policy he was buying included sufficient "replacement cost coverage" to "provide full coverage to replace all business personal property in case of a total loss, regardless of the policy limit." (*Nacsa, supra,* 51 Cal.App.4th at p. 1093.) In reversing the summary judgment, the appellate court held that there were triable issues of fact as to whether the agent had "negligently represented the meaning and effect of the 'replacement cost coverage' endorsement . . . and thereby assumed a special duty to [the insured] to ensure it had the coverage it thought it had purchased." (*Id.* at p. 1095.) In so doing, the court rather helpfully organized

much of the authority discussed above into two parts, one (pt. II) being entitled "*An Agent's General Duty of Care Does Not Include Responsibility for Ensuring the Insured Has Adequate Coverage to Protect Against all Eventualities.*" (*ibid.*) and the other (pt. III) being entitled "*An Insurance Agent Can Assume a Special Duty Toward His Insured by Misrepresenting Policy Terms.*" (*Id.* at p. 1096.) Because what was involved was allegedly an affirmative misrepresentation concerning the quality and scope of the insurance being provided, the court had no difficulty in holding that that case came within the authority summarized in its part III.

## D.  *Our Resolution of the Case*

The general rule in cases of this sort is still that articulated by now-Justice Kennard in *Jones.* ■ It is that, as a general proposition, an insurance agent does not have a duty to volunteer to an insured that the latter should procure additional or different insurance coverage.[2] This rule is well summarized by the part II caption from *Nacsa* quoted above. (*Nacsa, supra,* 51 Cal.App.4th at p. 1095.) The rule changes, however, when—but only when—one of the following three things happens: (a) the agent misrepresents the nature, extent or scope of the coverage being offered or provided (as in *Free, Desai* and *Nacsa*), (b) there is a request or inquiry by the insured for a particular type or extent of coverage (as in *Westrick*), or (c) the agent assumes an additional duty by either express agreement or by "holding himself out" as having expertise in a given field of insurance being sought by the insured (as in *Kurtz*).

■ Appellants urge, inter alia, that both exceptions (b) and (c) above apply in this case. They argue that the record would support findings that Hayes specifically represented that the Fitzpatricks, automobile insurance was adequate and that he "assumed" a duty to advise them of the availability of personal umbrella coverage. Alternatively, they argue that, in any event, we should impose such a duty "as a matter of public policy."

Appellants rely principally upon the following two contentions they maintain are supported by the record:

(1)  Despite knowing that the Fitzpatricks generally wanted the upper limits of coverage, and despite the fact that "he alone" was aware that State Farm offered a $1 million personal umbrella policy at no substantial additional cost, Hayes (appellants' source of insurance for 20 years) reviewed the

---

[2]At oral argument, appellants' counsel suggested that *Jones* was a case involving essentially business or commercial insurance and that its rule should be so limited. We do not agree.

Fitzpatricks' "insurance coverage several times and told them it was adequate."

(2) State Farm held its agents out as experts in giving advice to clients regarding coverage and advertised that those agents performed a formal "Family Insurance Checkup" and, although Hayes never in fact did so with them, he did "basically the same thing" at a May 9, 1991, meeting with them concerning the insurance in effect on their (then) four pieces of investment real estate.[3]

Contention (1) above overstates the record considerably. Neil Fitzpatrick's declaration, submitted in opposition to respondents' motion for summary judgment, states only that he "relied on Ted Hayes to advise me concerning adequate coverage, and he led me to believe that the automobile coverage that was previously carried was fine." Notably lacking from this conclusory statement is any allegation concerning any sort of specific inquiry from him to Hayes much less specific advice in the opposite direction.

In his deposition, Neil Fitzpatrick added very little to this. Regarding any conversation with Hayes at the time the insurance on the Lexus was shifted to a personal account, he could recall only that Hayes said that the $500,000 liability limits "should be about right. And then I recall him checking things off. And he said, everything else, the summation was everything else seemed fine. And that was about it."

For his part, Hayes testified that he never discussed uninsured or underinsured motor vehicle coverage with either Fitzpatrick and that the reason he recommended keeping the liability limit on the Lexus at $500,000 was because that had been the previous policy's limits.

More critical to the answer to this contention, however, are the numerous admissions of appellants that they *never* raised the subject of either personal umbrella coverage or additional underinsured motorist coverage with Hayes at any time nor did Hayes give them advice regarding higher or additional underinsured motorist coverage. In our view, the combination of the conclusory and nonspecific evidence proffered by appellants as to what Hayes had

---

[3]At that meeting, interestingly, Hayes did raise with the Fitzpatricks the possibility of an umbrella policy. Neil Fitzpatrick testified that the policy discussed "was really business oriented," as the focus of the discussion was insurance on investment properties. In any event, the Fitzpatricks decided against buying such a policy because they were planning to sell some of those properties. However, in a June 12, 1991, letter attached to a declaration submitted by *appellants' counsel* in the trial court, Hayes stated: "I have not heard from you [since that meeting] regarding the earthquake coverage on your home *and the umbrella policy[. A]re you interested in either of these coverages at this time?*" (Italics added.)

in fact advised them and these very clear denials of both any sort of targeted inquiry by them or advice by Hayes defeats appellants' claim that Hayes knew or should have known that they wanted a personal umbrella policy.[4]

As noted, appellants' second contention is that State Farm "held out" Hayes (and its other agents) as having special expertise in the area of personal insurance needs and hence "assumed" an additional duty to appellants. In support of this contention, they rely most strongly on (a) a short State Farm brochure promoting the desirability of insureds asking for a "Family Insurance Checkup" and (b) a declaration of a former State Farm agent to the general effect that, if Hayes had not alerted the Fitzpatricks to their need for a personal umbrella policy, he was not "acting within the standards of care applicable to State Farm agents . . . ."

Neither of these items of evidence is at all persuasive. In the first place, there is no evidence that the Fitzpatricks ever saw much less relied upon the brochure. Second, even a cursory reading of that brochure makes clear that it is far from a "holding out" of special expertise; rather, and in very bland terms, it suggests that the insured ask himself or herself—and perhaps then the agent—about additional insurance needs. And, finally, the declaration from the former State Farm agent is being utilized by appellants to attempt to define the duty of a State Farm agent, whereas its language ("not have been acting within the standard of care") is language of breach. As we noted at the outset, the responsibility of defining duty in a tort case reposes with the court (see also *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370, 397 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835]) and we neither know of nor have been cited to any authority permitting us to rely on such a document to redefine an insurance agent's duty of care.

Similarly, we reject appellants' alternative invitation to effectively expand the duties of insurance agents, brokers and insurers by imposing, on the basis of "public policy" and the facts of this case, a duty on Hayes to affirmatively volunteer advice to the Fitzpatricks regarding not just additional underinsured motorist coverage, but indeed the availability of a new and separate policy to effectuate that additional coverage. The factors cited by appellants in favor of such an expanded duty, e.g., the longtime relationship between them and their agent, the generally superior knowledge of the agent regarding coverages, the agent's review of the policies issued, etc., were almost all present in the authorities discussed above in which the courts have steadfastly refused to find any such enlarged duty. Even if we were disposed to

---

[4] If any additional support is needed in support of this conclusion, it is provided by the evidence cited in the immediately preceding footnote, especially Hayes's June 12, 1991, letter.

expand the scope of tort duties generally, which we are not, this record simply does not present an appropriate basis upon which to do so.

## IV. DISPOSITION

The judgment is affirmed.

Lambden, J., and Ruvolo, J., concurred.

A petition for a rehearing was denied October 8, 1997, and appellants' petition for review by the Supreme Court was denied November 25, 1997.